# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| GS LABS, LLC, *a Nebraska limited liability company*, | ) ) ) ) | Case No.: 21-cv-2400 |
| Plaintiff, | ) ) | |
| v. | ) ) | **COMPLAINT** |
| MEDICA INSURANCE COMPANY, *a Minnesota insurance corporation*, | ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) ) | |

Plaintiff GS Labs, LLC ("GS Labs") states and alleges as follows:

## NATURE OF SUIT

1.     This is an action seeking full reimbursement for the publicly-posted cash price of life-saving COVID-19 diagnostic testing that GS Labs provided (without requiring prepayment) to over 16,000 insureds of Defendant Medica Insurance Company ("Medica"), in response to the federally-established policy and law enacted to address the crippling worldwide pandemic, which has claimed over 700,000 American lives.

2.     Despite GS Labs' repeated requests for reimbursement, Medica has willfully, and in deliberate disregard of the law and the rights and safety of others and the public health, refused to fully reimburse GS Labs the statutorily-required price advanced by GS Labs as a credit in Medica's benefit for testing Medica's insureds for COVID-19.

3.     GS Labs seeks a money judgment in its favor for the full reimbursement Medica owes GS Labs, including interest, fees, and costs, in an amount that greatly exceeds $75,000, totaling several million dollars, and which increases each day.

## JURISDICTION AND VENUE

4.     This Court has subject-matter jurisdiction over all causes of action asserted herein under 28 U.S.C. §§ 1331, 1332, 1367.

5.     First, the Court has jurisdiction over the claims arising under federal law, specifically the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act").

6.     Second, there is also complete diversity of citizenship, and the amount in controversy exceeds $75,000.

7.     GS Labs is a Nebraska limited liability company with a principal place of business of Omaha, Nebraska. GS Labs' sole member is a residents of Nebraska.

8.     Medica is a Minnesota insurance corporation with a principal place of business of 401 Carlson Parkway, Minnetonka, MN 55305.

9.     Third, the Court has supplemental jurisdiction over GS Labs' state law claims that are related to GS Labs' federal claims.

10.    This Court has personal jurisdiction over Medica, which is a resident of the State of Minnesota, conducts significant business operations in Minnesota, and is registered to do business in Minnesota with the Secretary of State and Department of Commerce.

11.    This Court is a proper venue under 28 U.S.C. § 1391(b)(1)-(2). Defendant resides in the District of Minnesota, and the events and omissions giving rise to the claims herein occurred in the District of Minnesota.

## FACTUAL BACKGROUND

**GS Labs Invested Substantial Resources
to Respond to the Crisis Created by the COVID-19 Pandemic**

12.     GS Labs was formed in January 2020 as a clinical lab in Omaha, Nebraska.

13.     In response to the COVID-19 public health emergency in early 2020, GS Labs invested in and opened over 50 testing sites across the country.

14.     A new entrant to the nascent diagnostic testing market, GS Labs had to make substantial investments to expeditiously develop infrastructure and a team for delivering its testing services from the ground up in response to the fast-spreading pandemic.

15.     Given the unusually high infection rate of COVID-19 and the need for rapid testing to prevent community spread, GS Labs' founders focused on maximizing appointment availability, providing safe and accessible drive-through testing administration, and, where possible, delivering same-day test-results.

16.     Additionally, to maximize testing capacity, GS Labs intended that the hours of operation for its sites would be seven days per week, twelve hours per day.

17.     GS Labs invested substantial resources in developing a secure intake and results distribution software technology platform, procuring numerous testing locations and space, purchasing supplies and equipment, and more.

18.     GS Labs also assembled its own in-house support teams, including staffing and billing personnel, and committed to employing highly-credentialed test administrators such as registered nurses ("RNs") to be present on-site.

19.     As a result of GS Labs' extensive planning and substantial investments, it quickly established the capacity to administer tests to up to 1,000 patients per day at each of its testing sites—9 of which were opened in Minnesota.

20.     Patients can now book appointments to occur as soon as within 15 minutes, and receive test results as soon as within 20 minutes.

21.     GS Labs' planning and investments have enabled it to test more patients, and provide results quicker, than incumbent testing providers such as retail pharmacies.

22.     GS Labs' testing capacity is several times greater than other COVID-19 diagnostic testing providers; and, therefore, GS Labs is a key player in the continued public health response to COVID-19 and in saving lives across the country.

### GS Labs Has Administered COVID-19 Tests for Over 90,000 Minnesotans and Over 16,000 Medica Insureds

23.     GS Labs is a leading provider of testing; in September 2021, GS Labs accounted for more than 22% of the rapid antigen COVID-19 tests conducted in Minnesota.

24.     Since March 2020, GS Labs has provided COVID-19 diagnostic tests to more than 90,000 Minnesotans.

25.     Of these, over 16,000 patients are Medica insureds.

26.     Over 20% of these Medica insureds have requested and received COVID-19 diagnostic testing from GS Labs on more than one occasion, demonstrating both their reliance on GS Labs and their satisfaction with GS Labs' testing.

27.     By administering this diagnostic testing, GS Labs has provided a vital and valuable community service to Minnesotans and to Medica and its insureds.

28.     In addition, GS Labs has supported and assisted the state's testing needs.

29.     Indeed, studies have shown that increased availability of rapid COVID-19 testing, which is facilitated and made readily accessible by providers like GS Labs, dramatically improves patient health outcomes, reduces the spread of the virus, saves lives, and prevents and (consequently) reduces medical spend.

**GS Labs Provides Testing in Three Different Formats, All Approved**
**by the Center for Disease Control ("CDC") for COVID-19 Diagnostic Testing**

30.     GS Labs has provided three different types of COVID-19 tests to these individuals in Minnesota:

1.     "Rapid Antigen" test ("Antigen test");

2.     "Polymerase Chain Reaction" test ("PCR test"); and

3.     "Rapid Antibody" test ("Antibody" test).

31.     The CDC has determined all three of these tests are medically appropriate for COVID-19 diagnostic testing purposes.

32.     The Antigen test requires a nasal swab and it detects protein fragments that are specific to COVID-19. All Antigen test products that GS Labs uses fall under the FDA's Emergency Use Authorization. The results of the Antigen test can be available as quickly as within 20 minutes from the time of the test.

33.     The PCR test requires a nasal or oral swab and detects genetic material that is specific to COVID-19. All PCR test products that GS Labs uses fall under the FDA's Emergency Use Authorization. The results from the PCR test typically take between 2-5 days following the test.

34.     The Rapid Antibody test requires a blood sample and detects antibodies that a person has developed as a result of COVID-19 infection. All antibody test products that GS Labs uses for antibody testing fall under the FDA's Emergency Use Authorization. The results from the Rapid Antibody test can be available as quickly as within 20 minutes from the time of the test.

35.     Further, GS Labs performs confirmatory PCR tests for patients that have a negative rapid antigen result, so as to verify the rapid results and protect against false negative rapid results that could jeopardize the public health.

## GS Labs Has Performed, And Continues To Perform, Thousands of Medically Necessary COVID-19 Diagnostic Tests for Medica's Insureds

36.     Since March 2020, GS Labs has performed thousands of COVID-19 diagnostic tests for Medica's insureds without requiring any prepayment.

37.     GS Labs has timely submitted requests for reimbursement to Medica and billed for the relevant testing services consistent with the applicable cash price publicly posted on GS Labs' website, as expressly authorized by the CARES Act.

38.     GS Labs submitted its first request for reimbursement on October 21, 2020. GS Labs has submitted monthly requests for reimbursement every month since.

39.     Medica has withheld full reimbursement and demanded that GS Labs provide voluminous medical records for each test performed for Medica's insureds. However, as explained below, federal law prohibits "pre-approval" and "medical necessity" reviews, as the CARES Act is designed to promote rapid accessibility to testing and results.

40.     Although the information Medica requested was not required, GS Labs provided it as quickly as it was able to do so. Despite this, Medica still has refused to fully reimburse GS Labs for all tests provided to Medica's insureds.

41.     After five months of Medica failing to provide full reimbursement, GS Labs engaged counsel and has sought to work through Medica's demands to pay less than the publicly-posted cash price for COVID-19 diagnostic testing performed by GS Labs.

42.     Despite several months of discussions spanning March 2021 through the present, Medica has continued to refuse to fully reimburse GS Labs unless GS Labs agrees to Medica's beliefs as to what it deems an appropriate price.

43.     GS Labs has exhausted its efforts to resolve the dispute with Medica, and Medica has forced GS Labs to pursue litigation.

44.     Medica's demands and refusals are illegal attempts to countermand Congress's directive to insurers to reimburse COVID-19 diagnostic testing providers.

45.     Specifically, in response to this national health and financial crisis, Congress enacted the CARES Act, which clearly and expressly directs that "a health insurance issuer . . . *shall reimburse the provider* of the diagnostic testing as follows:"

> (1) If the health plan or issuer has a negotiated rate with such provider in effect before the public health emergency declared under section 319 of the Public Health Service Act (42 U.S.C. § 247d), such negotiated rate shall apply throughout the period of such declaration.
>
> (2) *If the health plan or issuer does not have a negotiated rate with such provider, such plan or issuer shall reimburse the provider in an amount that*

> *equals the cash price for such service as listed by the provider on a public*
> *internet website*, or such plan or issuer may negotiate a rate with such
> provider for less than such cash price.

CARES Act § 3202(a) (emphasis added).

46.     Through its enactment of the CARES Act, Congress required that health insurers "shall reimburse" COVID-19 diagnostic testing providers directly for testing that the providers have stepped-up to deliver to those insurers' insureds.

47.     The CARES Act plainly states if the health insurer had previously negotiated rates with the provider, the insurer shall pay the negotiated rates. But if the insurer has not negotiated rates—which Medica has failed to do here—then the insurer shall pay "the cash price for such service as listed by the provider on a public internet website."

48.     In sum, the insurer may choose to negotiate a different price, but otherwise it "shall reimburse" the provider in the amount of the publicly-posted cash price.

49.     The CARES Act does not condition reimbursement on any insurance company's unilateral determinations of "medical necessity" or "medical appropriateness." On the contrary, federal guidance regarding the CARES Act states that plans and issuers cannot "use medical screening criteria to deny (or impose cost sharing on) a claim for COVID-19 diagnostic testing" for asymptomatic patients, and they "cannot require the presence of symptoms or a recent known or suspected exposure, or otherwise impose medical screening criteria on coverage of tests." FAQs, Part 44 Q1 (Feb. 26, 2021).[1]

---

[1] *Available at* https://www.cms.gov/files/document/faqs-part-44.pdf.

50.     Regardless, there can be no reasonable issue as to "medical necessity" as to the COVID-19 diagnostic testing at issue in this lawsuit because all of GS Labs' tests are ordered by a licensed medical professional and are, by definition, medically necessary.

### Medica Has Violated the CARES Act and Minnesota Law By Unjustifiably Refusing to Fully Reimburse GS Labs

51.     GS Labs has repeatedly requested reimbursement from Medica for COVID-19 diagnostic tests provided to Medica insureds without prepayment.

52.     Medica has refused to pay the full publicly-posted cash price for GS Labs' tests, preferring instead to attempt to negotiate a lower price.

53.     GS Labs negotiated with Medica in good faith. GS Labs devoted considerable time and resources in responding to Medica's requests for information.

54.     However, on information and belief, Medica did not negotiate in good faith and instead merely used its requests for information as a delay tactic.

55.     Specifically, Medica's requests for medical documentation as a ground for evaluating GS Labs' request for reimbursement was illusory, as it is clear medical appropriateness or necessity is not a ground to deny reimbursement under the CARES Act—and, regardless, GS Labs provided voluminous information on medical appropriateness and necessity regardless, but Medica still refuses to fully reimburse.

56.     Medica and GS Labs have not agreed upon a different negotiated cash price, and their discussions have broken down and are at an impasse.

57.     The current amount due GS Labs by Medica greatly exceeds $75,000.

58.     Therefore, GS Labs has now been forced to bring this Complaint to obtain reimbursement and other damages resulting from Medica's brazen refusals to reimburse GS Labs in violation of the federal CARES Act, as well as in contravention to state law.

### COUNT I: VIOLATION OF THE CARES ACT

59.     GS Labs repeats all foregoing allegations and realleges them herein.

60.     The CARES Act § 3202(a) provides that "a health insurance issuer . . . *shall reimburse the provider* of the diagnostic testing . . . in an amount that equals the cash price for such service as listed by the provider on a public internet website." (emphasis added).

61.     The text and history of the CARES Act and § 3202(a) demonstrate that Congress intended to provide a private cause of action to providers of diagnostic testing for reimbursement owed by insurers.

62.     First, the text of § 3202(a) makes clear that Congress intended to benefit "provider[s] of the diagnostic testing" who have stepped forward to provide the diagnostic testing by *requiring* that health insurance issuers "shall reimburse" those providers at the publicly-posted cash price unless a different rate has been negotiated.

63.     Therefore, by its terms, § 3202(a) confers a specific right and private cause of action to GS Labs as a provider of such diagnostic testing.

64.     There are no enforcement provisions in the CARES Act regarding reimbursement to providers of diagnostic testing from which to infer that Congress intended that there be some different or alternative means, other than a private cause of action, by which providers such as GS Labs shall be reimbursed.

65.     Second, the federal legislative and executive branches of government have adopted and actively promoted national policies to encourage extensive and swift COVID-19 diagnostic testing and to incentivize providers like GS Labs to make the substantial investments and undertake the significant, inherent risks required to quickly develop, implement, and provide these critically important diagnostic test services by requiring that these providers shall be promptly reimbursed at a clear rate set by law.

66.     Congress thus passed, and the President signed, the CARES Act with the intention of providing for necessary widespread testing by requiring out-of-network COVID-19 test payment at published cash prices, to support a greater supply of and access to rapid testing.

67.     As articulated by one member of Congress:

> In the end, the only way to end this crisis-and the only way to get the American economy moving again-is to contain the disease. This will require, as soon as possible, adopting a new goal. *That goal should be to test every American who needs it for COVID-19 as soon as possible . . . . the sooner we make more tests available and stop telling Americans not to get a test, the better.*

166 Cong. Rec. S1895-03, 166 Cong. Rec. S1895-03, S1895 (Sen. Alexander, R-Tenn.) (emphasis added).

68.     Another explained:

> We are also hearing of shortages in swabs-simple swabs-simply to take the test. *We need to ramp up the testing supply. We also need to knock down the barriers to getting tests.* We need to adopt the South Korean model, and many of us have been calling for this for a long time. We see States and Governors moving forward with this, but *the Federal*

> *Government needs to take a much more active role in establishing that infrastructure*

166 Cong. Rec. S1882-01, 166 Cong. Rec. S1882-01, S1884 (Sen. Van Hollen, D-Md) (emphasis added).

69.   And, as stated, the executive branch has issued guidance stating that COVID-19 diagnostic testing shall be reimbursable regardless of an insurer's unilateral or idiosyncratic views on medical necessity. FAQs, Part 44 Q1 (Feb. 26, 2021).

70.   Third, nothing in § 3202(a) or the rest of the CARES Act expressly denies or precludes a private cause of action by providers against health insurance issuers for reimbursement for diagnostic testing.

71.   Congress did not give health plans and health insurance issuers any discretion in determining whether or when they "shall reimburse providers" for COVID-19 testing and related services or the rates at which to reimburse providers for such services.

72.   Fourth, implying a private cause of action for the benefit of providers of diagnostic testing against health insurance issuers is consistent with the purposes of the CARES Act, which included ensuring adequate and swift access to COVID-19 diagnostic testing throughout the entire country, whether in- or out-of-network.

73.   Implying a private cause of action also carries out the CARES Act's purpose of covering the substantial investments necessary for the start-up and operational costs made by new providers of these diagnostic testing services that were desperately needed in a very short amount of time.

74.     Fifth, implying a private cause of action for the benefit of providers of diagnostic testing against health insurance issuers is also necessary to ensure the CARES Act's effectiveness and the achievement of federal policy in the realm of diagnostic testing.

75.     Without a means for providers of diagnostic testing to obtain reimbursement for the COVID-19 tests they provided without prepayment, these providers will go out of business, leading to dramatically less testing availability and efficacy in contravention to federal law and policy objectives.

76.     Sixth, providing for reimbursement for national and global pandemic-related expenses is an interstate and federal matter that is not traditionally relegated to state law.

77.     Indeed, in every pandemic over the last 100 years, Congress has enacted legislation at the federal level to deal with the national disaster of the time.

78.     The CARES Act is Congress's response to the COVID-19 pandemic, which has claimed over 700,000 American lives.

79.     This is not an area that is of concern only to states, such that it would be inappropriate to infer a private cause of action under federal law.

80.     Seventh, if the CARES Act does not provide for an implied private cause of action, then it would fail in its evident objective to protect providers of diagnostic testing because that would leave these providers with no remedy under federal law.

81.     It is illogical to reason that Congress granted a right of reimbursement by insurers to providers of diagnostic testing, but then intentionally left these same providers with no federal remedy to enforce that right of reimbursement owed by the insurers.

82.     In addition, no federal agency has filled the statutory gap and attempted to enforce providers' rights under § 3202(a).

83.     For these and additional reasons, there is an implied cause of action in favor of providers of diagnostic testing against health insurance issuers under § 3202(a) of the CARES Act for reimbursement of the publicly-posted cash price of COVID-19 testing.

84.     GS Labs has repeatedly requested full reimbursement from Medica for COVID-19 diagnostic tests provided to Medica insureds.

85.     The current amount due GS Labs by Medica greatly exceeds $75,000.

86.     Medica has refused to pay the publicly-posted cash price for GS Labs' tests.

87.     The Parties have not agreed to a different negotiated rate for the testing.

88.     As a direct and proximate result of Medica's refusals to fully reimburse GS Labs in violation of the CARES Act, GS Labs has incurred, and will continue to incur, substantial damages, costs and expenses in an amount greatly in excess of $75,000 plus investigative costs, attorneys' fees, and additional costs and disbursements, the exact amount to be established at trial.

## COUNT II: DECLARATORY JUDGMENT

89.     GS Labs repeats all foregoing allegations and realleges them herein.

90.     There exists a substantial and justiciable controversy between GS Labs and Medica regarding whether the CARES Act requires Medica to fully reimburse GS Labs at the publicly-posted cash price for COVID-19 diagnostic testing.

91.     There also exists a substantial and justiciable controversy between GS Labs and Medica regarding whether GS Labs has an implied private cause of action under the CARES Act (as set forth in Count I) to recover that reimbursement from Medica.

92.     GS Labs and Medica have genuinely opposed interests on these subjects, and those opposed interests are direct and substantial.

93.     A judicial determination as to GS Labs' rights under the CARES Act will be final and conclusive as to both party's respective rights and obligations.

94.     Pursuant to the Federal Declaratory Judgment Act (28 U.S.C. §§ 2201, et seq.), GS Labs is entitled to a declaration it is entitled to full reimbursement from Medica at the publicly-posted cash price for COVID-19 testing; and that GS Labs has an implied private cause of action under the CARES Act (as set forth in Count I) to recover that reimbursement from Medica.

## **COUNT III: UNJUST ENRICHMENT**

95.     GS Labs repeats all foregoing allegations and realleges them herein.

96.     GS Labs alleges this claim for unjust enrichment in the alternative to Counts I and II.

97.     Medica has knowingly received value and benefits through the diagnostic testing GS Labs has provided to Medica's insureds without prepayment.

98.     Medica has unlawfully retained this value and benefit by refusing to fully reimburse GS Labs for the diagnostic testing that GS Labs has provided to Medica's insureds without prepayment.

99.     The circumstances under which Medica received this value and benefit from GS Labs, accounted for in the form of a prepayment credit, make it unjust and inequitable to permit Medica to retain them.

100.    It is not legally justifiable for Medica to retain the value and benefit conferred upon it by GS Labs' provision of diagnostic testing to Medica's insureds without prepayment.

101.    In equity and good conscience, Medica should fully reimburse GS Labs for the value and benefit of the COVID-19 diagnostic testing that have been provided to Medica's insureds without prepayment.

102.    GS Labs is entitled to the federally-established statutory value of the COVID-19 diagnostic testing that GS Labs has provided to Medica insureds, which greatly exceeds $75,000, plus interest and costs.

103.    As a direct and proximate result of Medica's refusals to fully reimburse, GS Labs has incurred, and will continue to incur, substantial damages, costs and expenses in an amount greatly in excess of $75,000 plus investigative costs, attorneys' fees, and additional costs and disbursements, the exact amount to be established at trial.

## COUNT IV: NEGLIGENCE PER SE

104.    GS Labs repeats all foregoing allegations and realleges them herein.

105.    GS Labs alleges this claim for negligence per se in the alternative to Counts I and II.

106.    Medica owes GS Labs a duty of care of that of an ordinary prudent insurer acting in similar circumstances during a public health emergency and viral pandemic.

107.    The CARES Act established a statutory standard of care for the ordinary prudent insurer in these circumstances, specifically as to the COVID-19 pandemic.

108.    The CARES Act's standard of care establishes that an ordinary prudent insurer in these circumstances would fully reimburse a provider at the publicly-posted cash rate for diagnostic testing in the event there is no separately-negotiated rate.

109.    In passing the CARES Act, specifically § 3202, Congress intended to protect diagnostic testing providers like GS Labs from both non-payment and under-payment during the public health emergency and viral pandemic, by imposing a standard of care that requires that insurers like Medica "shall reimburse" providers like GS Labs at the publicly-posted cash rate for diagnostic testing in the event there is no separately-negotiated rate and the provider administers tests without prepayment.

110.    Other insurance companies have acted consistent with this duty and fully paid GS Labs as required by the CARES Act, and there is no reason Medica cannot do the same.

111.    Medica breached the statutory duty of care established in § 3202 for the benefit of providers like GS Labs by refusing to fully reimburse at the full publicly-posted cash price for GS Labs' COVID-19 diagnostic tests provided to Medica's insureds.

112.    Medica's refusals to fully reimburse GS Labs have directly caused GS Labs to suffer a loss of substantial revenue, and have also directly caused GS Labs to suffer collateral consequences such as lost time value of money, lost opportunities, and more.

113.    As a direct and proximate result of Medica's breach of the applicable standard of care by its refusals to fully reimburse for testing rendered, GS Labs has

incurred, and will continue to incur, substantial damages, costs and expenses in an amount greatly in excess of $75,000 plus investigative costs, attorneys' fees, and additional costs and disbursements, the exact amount to be established at trial.

## COUNT VI: PUNITIVE DAMAGES

114.   GS Labs repeats all foregoing allegations and realleges them herein.

115.   GS Labs alleges and is entitled to punitive damages under Minnesota Statute §§ 549.191 and 549.20.

116.   In willfully refusing to fully reimburse GS Labs for COVID-19 diagnostic testing provided to Medica insureds, and by ignoring GS Labs' numerous and repeated requests to Medica for reimbursements owed, Medica has acted with deliberate disregard for the rights and safety of others in the midst of this national and global pandemic crisis.

117.   First, Medica's willful refusals to fully reimburse GS Labs constitutes deliberate disregard—in addition to contempt—for the rights and safety of its own insureds who have needed, currently need, and will need in the future the COVID-19 diagnostic testing GS Labs has provided, without requiring prepayment, at great expense.

118.   Medica's refusals to fully reimburse coveys to insureds who are knowledgeable of these refusals that Medica will not support or pay for certain testing, which is likely to create the false impression that the insured may eventually be personally liable for the testing. This false impression, in turn, is likely to discourage these insureds to seek out necessary diagnostic testing, which is contrary to the state's and nation's efforts to combat the raging COVID-19 pandemic.

119.     Second, Medica's refusals to fully reimburse GS Labs for these diagnostic testing received by Medica insureds without prepayment shows Medica's deliberate disregard for the rights of GS Labs under the CARES Act. The statute is clear: Medica "*shall reimburse*" GS Labs at the publicly-posted cash price. Despite this clear requirement and obligation, Medica has willfully and brazenly refused to reimburse GS Labs.

120.     Third, Medica's refusals to fully reimburse GS Labs also signals to the public at large that certain testing may not be supported or covered, which is likely to create the false impression that insureds generally may be personally liable for diagnostic testing. This false impression, in turn, is likely to discourage the public from obtaining necessary testing. This false impression thus undermines Congress's goals in enacting the CARES Act, as well as the goals of both state and federal public health officials throughout the country.

121.     Medica's refusals to fully reimburse further threaten the public health because studies have shown that increased availability of rapid COVID-19 testing, which is facilitated and made readily accessible by providers like GS Labs, dramatically improves patient health outcomes, reduces spread, saves lives, and (consequently) reduces medical spend.  Medica has acted in deliberate disregard of the known and readily-understood benefits provided and lives saved by GS Labs' preventative COVID-19 diagnostic testing.

122.     In addition, as stated, by refusing to fully reimburse substantial amounts due to providers like GS Labs, Medica is destabilizing the sources for essential diagnostic testing and is showing deliberate disregard for the rights and safety of the public at large because these refusals to reimburse threaten the ability for providers like GS Labs to

continue to operate and provide necessary diagnostic testing. Provider failures due to non-reimbursement threatens to decrease the public's access to critical diagnostic testing.

123.   Furthermore, by refusing to fully reimburse, Medica is discouraging potential new providers in the diagnostic testing space from making the necessary investments to enter and perform testing, which reduces the public's access to diagnostic testing.

124.   Thus, by refusing to fully reimburse GS Labs, Medica is acting with deliberate disregard for the public health and safety of all Minnesotans.

125.   Medica has knowledge of these facts and has intentionally disregarded these facts showing that its refusals create a high probability of substantial injury to its insureds, GS Labs, and public health and safety.

126.   Medica has deliberately proceeded to refuse to fully reimburse in conscious and intentional disregard of the high degree of probability of these injuries.

127.   And Medica has also proceeded to act with indifference to the high probability of these injuries, placing its own financial interests ahead of all others.

128.   Medica has acted in this way notwithstanding the dire seriousness of the risks and hazards to the public arising from its refusals to fully reimburse GS Labs.

129.   Medica has acted this way despite the extreme seriousness of the COVID-19 pandemic, which has already claimed over 700,000 American lives.

130.   Medica has acted in this way despite its ability to reimburse GS Labs in full.

131.   And, on information and belief, Medica did not negotiate in good faith with GS Labs and instead used its requests for information as a delay tactic over the span of several months. These requests were illusory, as it is clear medical appropriateness or

necessity is not a ground to deny reimbursement under the CARES Act—and, regardless, GS Labs provided voluminous information on medical appropriateness and necessity regardless, but Medica still refuses to fully reimburse.

132.   Other insurance companies have fully paid GS Labs as required by the CARES Act, and there is no reason Medica cannot do the same.

133.   Awarding punitive damages against Medica for Medica's refusals to fully reimburse GS Labs is necessary to both compensate GS Labs, as well as deter other insurance companies from similarly refusing to fully reimburse and risking irreparable harm to the public and public health and safety.

## PRAYER FOR RELIEF

**WHEREFORE**, GS Labs requests relief from this Court as follows:

A.   A declaration that the CARES Act requires Medica to fully reimburse GS Labs at the publicly-posted COVID-19 cash prices for diagnostic testing provided to Medica's insureds;

B.   Judgment in favor of GS Labs and against Medica for the amounts due and owing GS Labs for COVID-19 diagnostic testing provided to Medica's insureds;

C.   Awarding GS Labs all costs and disbursements, including costs of investigation and reasonable attorneys' fees incurred in connection with this matter;

D.   Awarding GS Labs interest on amounts due to GS Labs, including interest at the rate of 1.5% per month, *see* Minn. Stat. § 62Q.75, subd. 2(c), (f); and prejudgment interest at the rate of 10% per year, *see* Minn. Stat. § 549.09(c)(1)(ii), or as provided for by federal law.

E.     Awarding GS Labs punitive damages for Medica's willful refusals to reimburse GS Labs and deliberate disregard of the rights and safety of others;

F.     A jury trial on any and all issues and claims so triable; and

G.     An order awarding any further relief deemed equitable and just by this Court.

Dated: October 28, 2021                    **WINTHROP & WEINSTINE, P.A.**

                                           *s/ Thomas H. Boyd*
                                           Thomas H. Boyd, #200517
                                           David Aafedt, #27561X
                                           Christianna Finnern, #310724
                                           Kyle R. Kroll, #398433
                                           225 South Sixth Street, Suite 3500
                                           Minneapolis, MN 55402
                                           T: (612) 604-6400
                                           tboyd@winthrop.com
                                           cfinnern@winthrop.com
                                           daafedt@winthrop.com
                                           kkroll@winthrop.com

                                           *Attorneys for Plaintiff GS Labs, LLC*

22718421v6

22