## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| GS Labs, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Medica Insurance Company, <br><br> Defendant. | Case No. 21-cv-2400 (SRN/TNL) <br><br><br> **ORDER ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANT'S MOTION TO DISMISS** |

Kyle R. Kroll, Christianna L. Finnern, David A. Aafedt, and Thomas H. Boyd, Winthrop & Weinstine, PA, 225 S. 6th St., Ste. 3500, Minneapolis, MN 55402, for Plaintiff

Charles Gokey, Jamie R. Kurtz, Jeffrey Sullivan Gleason, and Stephanie Alicia Chen, Robins Kaplan LLP, 800 LaSalle Ave., Ste. 2800, Minneapolis, MN 5402, for Defendant

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Plaintiff GS Labs, Inc.'s Motion for Partial Summary Judgment [Doc. No. 8] and Defendant Medica Insurance Company's Motion to Dismiss [Doc. No. 29]. Based on a review of the files, submissions, and proceedings herein, and for the reasons below, the Court denies Plaintiff's Motion for Partial Summary Judgment and grants Defendant's Motion to Dismiss.

## I.    BACKGROUND

Plaintiff GS Labs, Inc. ("GS Labs") was formed in January 2020 as a clinical lab in Omaha, Nebraska. (Compl. [Doc. No. 1] ¶ 12.) In early 2020, in response to the COVID-19 public health emergency, GS Labs opened 50 COVID-19 diagnostic testing sites throughout the United States. (*Id.* ¶ 13.) GS Labs asserts that as a new provider of

diagnostic testing, it made substantial investments to quickly develop the infrastructure and hire the staff necessary to deliver testing services, including the hiring of on-site registered nurses. (*Id.* ¶¶ 14, 17–18.) Because of the growing COVID-19 infection rate, GS Labs focused its efforts on appointment availability, accessibility, and capacity, and, where possible, same-day test results. (*Id.* ¶¶ 15–16.) GS Labs contends that as a result of its planning and investments, it quickly established nine testing sites in Minnesota, each with the capacity to administer COVID-19 tests to up to 1,000 patients per day. (*Id.* ¶ 19.) It asserts that its testing capacity is several times greater than other COVID-19 diagnostic testing providers. (*Id.* ¶ 22.)

Of the 90,000 Minnesotans whom GS Labs has tested since March 2020, 16,000 are insured by Defendant Medica Insurance Company ("Medica"). (*Id.* ¶¶ 24–25.) Over 20% of these Medica insureds requested and received COVID-19 diagnostic testing on more than one occasion. (*Id.* ¶ 16.) After performing these diagnostic tests without requiring prepayment, GS Labs submitted requests for reimbursement to Medica. (*Id.* ¶ 36.) GS Labs contends that it billed Medica at the rate "consistent with the applicable cash price publicly posted on GS Labs' website, as expressly authorized by the [Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020)]".[1] (*Id.* ¶ 37.) Federal regulations implementing the CARES Act define the "cash

---

[1] In addition to appropriating federal funding to address a variety of financial issues related to the COVID-19 pandemic, the CARES Act included numerous healthcare-related provisions concerning matters such as supply shortages, innovation, and access to healthcare for COVID-19 patients. (CARES Act, Pub. L. No. 116-136, Title III, Subtitles A, B, C.)

price" as the "charge that applies to an individual who pays in cash (or cash equivalent) for a COVID-19 diagnostic test."  85 FR 71142, 71152 (Nov. 6, 2020).

Rather than paying GS Labs at the cash-price rate, GS Labs alleges that Medica withheld payment and then requested medical records for each of its insureds' tests. (Compl. ¶ 39.)  After providing the requested information, GS Labs contends that Medica still refused to provide full reimbursement.  (*Id*. ¶ 40.)

Subsequently, GS Labs retained counsel who engaged in discussions with Medica in an effort to resolve the parties' dispute and obtain reimbursement.  (*Id*. ¶¶ 40–42.)  GS Labs asserts that Medica has continued to refuse to provide full reimbursement, asking instead that GS Labs accede to payment at a rate Medica deems appropriate.  (*Id*. ¶ 42.)

Failing to resolve their dispute, GS Labs filed this lawsuit in October 2021.  It asserts the following claims for relief against Medica:  (1) a violation of the CARES Act, § 3202(a) (*id*., Count I); (2) a declaratory judgment that (a) GS Labs is entitled to full reimbursement from Medica at its publicly-posted cash price for COVID-19 testing, and (b) GS Labs has an implied private cause of action under the CARES Act to recover reimbursement (*id*., Count II) ; (3) unjust enrichment (*id*., Count III); (4) negligence per se (*id*., Count IV); and (5) punitive damages (*id*., Count VI).[2]

Plaintiff moves for partial summary judgment on its declaratory judgment claim.  It contends that because the issues in question are purely legal matters, summary judgment is appropriate at this time.  (Pl.'s Mem. [Doc. No. 10] at 1.)  GS Labs argues that Congress

---

[2] The Complaint contains no Count V, but proceeds from Count IV to Count VI.

intended to grant an implied private right of action under § 3202(a) of the CARES Act, permitting providers to obtain reimbursement from insurers, and that it is entitled to full reimbursement from Medica at its publicly-posted cash price for COVID-19 testing. (*Id.* at 5–21.)

For its part, Medica opposes GS Labs' motion and affirmatively moves to dismiss all of GS Labs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6). It argues that that there is no private right of action under the CARES Act, therefore, Plaintiff's claims alleging a violation of the Act and seeking declaratory judgment under the Act fail as a matter of law. (Def.'s Mem. [Doc. No. 31] at 1–2, 7–12; Def.'s Opp'n [Doc. No. 36] at 16–27.) Medica further contends that Plaintiff's common law claims all fail to state a claim upon which relief can be granted. (Def.'s Mem. at 12–26.)

## II.   DISCUSSION

### A.   Standards of Review

The parties' motions implicate two different standards of review.

#### 1.   Summary Judgment

With respect to GS Labs' summary judgment motion, summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it may affect the outcome of the lawsuit." *TCF Nat'l Bank v. Mkt. Intelligence, Inc.*, 812 F.3d 701, 707 (8th Cir. 2016). And a factual dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating a motion

for summary judgment, the Court must view the evidence and any reasonable inferences drawn from the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Although the moving party bears the burden of establishing the lack of a genuine issue of fact, the party opposing summary judgment may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation marks omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Moreover, summary judgment is properly entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

### 2.    Motion to Dismiss

When considering a motion to dismiss under Rule 12(b)(6), the Court accepts the facts alleged in the complaint as true, and views those allegations in the light most favorable to the plaintiff. *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013). However, the Court need not accept as true wholly conclusory allegations or legal conclusions couched as factual allegations. *Id.* In addition, the Court ordinarily does not consider matters outside the pleadings on a motion to dismiss. *See* Fed. R. Civ. P. 12(d). Matters outside the pleadings include "any written or oral evidence in support of or in opposition to the pleading that provides some substantiation for and does not merely reiterate what is said in the pleadings," as well as statements of counsel at oral argument

that raise new facts not alleged in the pleadings. *Hamm v. Rhone-Poulenc Rorer Pharm., Inc.*, 187 F.3d 941, 948 (8th Cir. 1999). The Court may, however, "consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record." *Illig v. Union Elec. Co.*, 652 F.3d 971, 976 (8th Cir. 2011) (quoting *Mills v. City of Grand Forks*, 614 F.3d 495, 498 (8th Cir. 2010)).

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

### B.    CARES Act

As noted, the CARES Act, § 3202(a)(2), which was signed into law in March 2020, provides the legal basis for Counts I and II of GS Labs' Complaint.

As relevant here, Section 3202 of the CARES Act provides:

PRICING OF DIAGNOSTIC TESTING.

(a) REIMBURSEMENT RATES.—A group health plan or a health insurance issuer providing coverage of items and services described in section 6001(a) of division F of the Families First Coronavirus Response Act (Public Law 116–127) with respect to an enrollee *shall reimburse the provider* of the diagnostic testing as follows:

(1) If the health plan or issuer has a negotiated rate with such provider in effect before the public health emergency declared under section 319

6

of the Public Health Service Act (42 U.S.C. 247d), such negotiated rate shall apply throughout the period of such declaration.

(2) *If the health plan or issuer does not have a negotiated rate with such provider, such plan or issuer shall reimburse the provider in an amount that equals the cash price for such service as listed by the provider on a public internet website, or such plan or issuer may negotiate a rate with such provider for less than such cash price.*

(b)   REQUIREMENT TO PUBLICIZE CASH PRICE FOR DIAGNOSTIC TESTING FOR COVID–19.—

(1) IN GENERAL.—During the emergency period declared under section 319 of the Public Health Service Act (42 U.S.C. 247d), each provider of a diagnostic test for COVID–19 shall make public the cash price for such test on a public internet website of such provider.

(2) CIVIL MONETARY PENALTIES.—The Secretary of Health and Human Services may impose a civil monetary penalty on any provider of a diagnostic test for COVID–19 that is not in compliance with paragraph (1) and has not completed a corrective action plan to comply with the requirements of such paragraph, in an amount not to exceed $300 per day that the violation is ongoing.

Pub. L. 116–136, § 3202 (Mar. 27, 2020), 134 Stat. 367 (emphasis added).

Section 6001(a) of the Families First Coronavirus Response Act ("FFCRA"), referenced in § 3202(a), quoted above, provides, in relevant part:

COVERAGE OF TESTING FOR COVID–19.

(a) IN GENERAL.—A group health plan and a health insurance issuer offering group or individual health insurance coverage . . . shall provide coverage, and shall not impose any cost sharing (including deductibles, copayments, and coinsurance) requirements or prior authorization or other medical management requirements, for the following items and services furnished during any portion of the emergency period defined in paragraph (1)(B) of section 1135(g) of the Social Security Act (42 U.S.C. 1320b–5(g)) beginning on or after the date of the enactment of this Act:

(1) In vitro diagnostic products (as defined in section 809.3(a) of title 21, Code of Federal Regulations) for the detection of SARS– CoV–2 or

the diagnosis of the virus that causes COVID–19 that are approved, cleared, or authorized under section 510(k), 513, 515 or 564 of the Federal Food, Drug, and Cosmetic Act, and the administration of such in vitro diagnostic products.

(2) Items and services furnished to an individual during health care provider office visits (which term in this paragraph includes in-person visits and telehealth visits), urgent care center visits, and emergency room visits that result in an order for or administration of an in vitro diagnostic product described in paragraph (1), but only to the extent such items and services relate to the furnishing or administration of such product or to the evaluation of such individual for purposes of determining the need of such individual for such product.

(b) ENFORCEMENT.—The provisions of subsection (a) shall be applied by the Secretary of Health and Human Services, Secretary of Labor, and Secretary of the Treasury to group health plans and health insurance issuers offering group or individual health insurance coverage as if included in the provisions of part A of title XXVII of the Public Health Service Act, part 7 of the Employee Retirement Income Security Act of 1974, and subchapter B of chapter 100 of the Internal Revenue Code of 1986, as applicable.

(c) IMPLEMENTATION.—The Secretary of Health and Human Services, Secretary of Labor, and Secretary of the Treasury may implement the provisions of this section through sub-regulatory guidance, program instruction or otherwise.

(d) TERMS.—The terms "group health plan"; "health insurance issuer"; "group health insurance coverage", and "individual health insurance coverage" have the meanings given such terms in section 2791 of the Public Health Service Act (42 U.S.C. 300gg–91), section 733 of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1191b), and section 9832 of the Internal Revenue Code of 1986, as applicable.

Pub. L. 116–127, § 6001; 134 Stat 178.

"[P]rivate rights of action to enforce federal law must be created by Congress."

*Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Determining whether a federal law creates a private right of action "is basically a matter of statutory construction." *Transam.*

8

*Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 15 (1979).  GS Labs acknowledges that the CARES Act does not expressly provide a private right of action for a provider to seek full reimbursement for COVID-19 testing at the provider's publicly-posted cash price.  (*See* Pl.'s Mem. at 8; Pl.'s Opp'n [Doc. No. 39] at 9.)  Rather, GS Labs maintains that an implied right of action exists in light of § 3202(a)(2)'s requirement that insurers "shall reimburse the provider in an amount that equals the cash price."  (*Id.*; Pl.'s Opp'n at 9–31.)

Establishing an implied private right of action is a tall order, as "nothing short of an unambiguously conferred right will support an implied right of action."  *Osher v. City of St. Louis*, 903 F.3d 698, 702 (8th Cir. 2018) (citing *Does v. Gillespie*, 867 F.3d 1034, 1040 (8th Cir. 2017)).  The Supreme Court has expressed disfavor for implied private rights of action, having abandoned earlier jurisprudence that more readily recognized such rights.  *See Sandoval*, 532 U.S. at 287 ("Having sworn off the habit of venturing beyond Congress's intent, we will not accept respondents' invitation to have one last drink.").  The Supreme Court's "increasing reluctance" to imply new private causes of action, *Hofbauer v. Nw. Nat'l Bank of Rochester, Minn.*, 700 F.2d 1197, 1200 (8th Cir. 1983), described by one court as a "notoriously tight-fisted" approach is understandable since "the question at hand is whether a court should 'read into' a statute something that Congress did not 'write into' the statute."  *Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, __F. Supp. 3d__, No. 4:21-CV-01239-LPR, 2022 WL 496908, at *10 (E.D. Ark. Feb. 17, 2022).  While implied private rights of action are not precluded altogether, in order to imply such a right, the statutory provision must clearly demonstrate legislative intent to provide for both a private right and a private remedy.  *Sandoval*, 532 U.S. at 286–88 (stating that courts are

tasked with "interpret[ing] the statute Congress has passed to determine whether it displays an intent to create not just a private right, but also a private remedy.") (citation omitted)

The Supreme Court has identified four factors that may inform whether an implied right of action exists in a federal statute that does not expressly provide for one:

> *First*, is the plaintiff "one of the class for whose especial benefit the statute was enacted,"—that is, does the statute create a federal right in favor of the plaintiff? *Second*, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? *Third*, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And *finally*, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Cort v. Ash*, 422 U.S. 77, 78 (1975) (emphasis added) (citations omitted).

The "proper focus is on congressional intent," *Osher*, 903 F.3d at 702, with the *Cort v. Ash* criteria serving as indicia of that intent. *Transam. Mortg. Advisors*, 444 U.S. at 23–24. Without congressional intent, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Sandoval*, 532 U.S. at 286–87.

The Court is unaware of any controlling authority on the specific question of whether § 3202(a) of the CARES Act confers an implied right of action on a provider seeking reimbursement from a health plan or insurer based on the provider's cash-price reimbursement rates for COVID-19 testing. However, three recent district court cases have addressed the question, with two courts concluding no right of action exists, and one court

concluding that it does.[3]  *Compare Saloojas, Inc. v. Aetna Health of Calif., Inc.*, No. 22-cv-016, 2022 WL 2267786, at *3–5 (N.D. Cal. June 23, 2022) (finding no implied private right of action), *appeal filed*, No. 22-16034 (9th Cir. July 18, 2022); *Murphy Med. Assocs., LLC v. Cigna Health & Life Ins. Co.*, No. 3:20cv1675(JBA), 2022 WL 743088, at *2–6 (E. Conn. Mar. 11, 2011) (same), *with Diagnostic Affiliates of Ne. Hou, LLC v. United Healthcare Servs., Inc.*, No. 2:21-CV-00131, 2022 WL 214101, at *4–9 (S.D. Tex. Jan. 18, 2022) (concluding private right of action exists).  The Court addresses these three decisions in its discussion of the *Cort* factors below.

### 1.    Whether Plaintiff is in a Class the Statute Especially Intended to Benefit

The Court turns to the statutory text to determine whether it conveys an "unmistakable focus on the benefitted class," *Cannon v. Univ. of Chicago*, 441 U.S. 677, 689 (1979),  i.e., whether the plaintiff is "one of the class for whose especial benefit the statute was enacted."  *Cort*, 422 U.S. at 78.  If the statute focuses on the person or entity being regulated, rather than the class of persons being protected, it fails to imply "an intent to confer rights on a particular class of persons."  *Sandoval*, 532 U.S. at 289.  Language

---

[3] Many courts have found that other provisions of the CARES Act, not at issue here, do not create private rights of action. *See, e.g.*, *Lamar v. Hutchinson*, No. 4:21-CV-00529, 2021 WL 4047158, at *5 (E.D. Ark. Sept. 3, 2021) (finding no violation of stimulus provision of CARES Act when prison confiscated prisoner's incoming payments); *Adeleye v. Ducey*, No. CV-21-00679, 2021 U.S. Dist. LEXIS 122057, at *1  (D. Ariz. June 29, 2021) ("[T]he CARES Act does not create a private right of action" in case alleging failure to receive Pandemic Unemployment Assistance); *Am. Video Duplicating, Inc. v. City Nat'l Bank*, No. 2:20-CV-04036-JFW-JPR, 2020 WL 6882735, at *4 (C.D. Cal. Nov. 20, 2020) (finding no private remedy under CARES Act for agents denied a fee for assisting PPP lenders).

that focuses on the individuals protected is sometimes characterized as "rights-creating" language. *See id*. As one example noted by GS Labs, such rights-creating language is found in Titles IV and IX, which state "[n]o person shall . . . be subjected to discrimination." 42 U.S.C. § 2000d; 20 U.S.C. § 1681(a). Language focusing on the person regulated or language that enacts a general ban or simply expresses public policy does not demonstrate legislative intent to create an implied right of action. *Sandoval*, 532 U.S. at 289 (citing *Cannon*, 44 U.S. at 691 n.13). For example, the Court in *Sandoval* identified the following provision as language focusing on the person regulated: "each Federal department and agency . . . is authorized and directed to effectuate the provisions of [another statutory provision].") *Id*.

In support of its argument that § 3202(a) confers an implied private right of action, GS Labs points to two repeated phrases in the CARES Act: (1) that an insurer "*shall reimburse*" the provider of diagnostic testing; and (2) if there is no previously negotiated price between the insurer and provider, the insurer "*shall reimburse the provider*" at "the cash price for such service as listed by the provider on a public internet website." (Pl.'s Mem. at 10; Pl.'s Opp'n at 12–14) (citing § 3202(a)). GS Labs contends that the repeated use of "provider" and "shall reimburse" demonstrates clear congressional intent to create a private right of action for the benefit of diagnostic-testing providers. (Pl.'s Mem. at 10; Pl.'s Opp'n at 12–14.) But Medica argues that the language focuses on the regulated entities (insurers), not on a beneficiary class (diagnostic-testing providers), and therefore fails to suggest any congressional intent to provide a private right of action. (Def.'s Mem. at 9–10; Def.'s Opp'n at 18–21.)

As to whether the CARES Act contains "rights-creating" language "phrased in terms of the persons benefitted," *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002) (citation omitted), § 3202(a) provides:  "A group health plan or a health insurance issuer . . . *shall reimburse* the provider of the diagnostic testing."  (emphasis added).  This language focuses on the entities subject to regulation—group health plans and insurers—and directs them to reimburse diagnostic-testing providers.  It is not rights-creating language sufficient to imply a private right of action.  Hypothetically, as Medica notes, rights-creating language focused on the person being protected would instead state, "No diagnostic lab shall be reimbursed at an amount less than its cash price."  (Def.'s Reply [Doc. No. 42] at 2.)  However, § 3202(a) does not contain such rights-creating language.

Nor does the language of § 3202(a) "especially" benefit diagnostic laboratory providers such as GS Labs.  *Cort*, 422 U.S. at 78.  In *Osher*, 903 F.3d at 703, a lawsuit involving the eminent domain of the plaintiff landowner's property, the Eighth Circuit declined to find an implied right of action based on comparable statutory language.  Specifically, the court found language that "the head of the displacing agency *shall provide* for the payment of actual reasonable expenses," and "the head of the displacing agency *shall make* an additional payment" was phrased as a directive to the regulated agency, and was not rights-creating language from which congressional intent to create a private right of action could be implied.[4]  *Id*. at 702–03 (emphasis added).

---

[4] To the extent GS Labs argues that the statutory directive must be issued to an actual administrative *agency*, (Pl.'s Opp'n at 15–16), the law is not so narrowly proscribed.  The Supreme Court has stated, "Statutes that focus on the *person* regulated rather than the individuals protected" fail to imply a private right of action.  *Sandoval*, 532 U.S. at 289

Similarly, in *Hofbauer*, 700 F.2d at 1200–01, the Eighth Circuit reviewed a statutory command that "[e]ach federal instrumentality responsible for the supervision . . . of banks . . . *shall* by regulation *require* such institutions . . . to notify the purchaser . . . of [] special flood hazards." (emphasis added).  In finding this language failed to imply a private right of action, the court distinguished between the primary beneficiaries of the legislation (lenders), as opposed to secondary beneficiaries (borrowers).  In order to find an implied private right of action, the borrower plaintiffs were required to show more than simple membership in the borrower class of beneficiaries.  *Id*.  Rather, plaintiffs were required to show membership in a "special class" for whose benefit the statute was enacted, such "that Congress drafted the statute with an 'unmistakable focus on the benefitted class.'"  *Id*. at 1200 (quoting *Cannon*, 441 U.S. at 689, 691).  Because the court determined that the "unmistakable focus" was on lenders, it found no implied private right of action.  *Id*.

In *Cedar-Riverside Assocs., Inc. v. City of Minneapolis*, 606 F.2d 254, 256–57 (8th Cir. 1979), the Eighth Circuit also considered similar language in the form of a command: "The Department of Housing and Urban Development, and any other departments or agencies of the Federal Government having powers, functions, or duties with respect to housing, *shall exercise* their powers . . . consistently with the national housing policy[.]"  The Eighth Circuit found this language too general to indicate a private right of action.  *Id*. at 257–58.  Moreover, it determined that the plaintiffs—private developers of housing

---

(emphasis added).  This authority applies to a broader range of persons and entities than just administrative agencies.

projects—did not belong to a class "for whose especial benefit Congress enacted the Housing Act," even though they reaped some benefits:

> Although the legislative history of the 1968 and 1970 Acts indicates a congressional purpose to encourage private entrepreneurs in local home building industries, that history also discloses that Congress intended such assistance to private developers to serve as a means of achieving the underlying goal of the Housing Act; namely, additional well-planned housing for the benefit of the public. We conclude that the 1968 and 1970 Acts were not intended especially to benefit private developers such as the appellants.

*Id*. at 257 (citations omitted).  Ultimately, the court found the statute failed to confer an implied right of action on private parties.  *Id*. While the language here, in § 3202(a), is not as general as the statute in *Cedar-Riverside*, the case demonstrates the Eighth Circuit's distinction between primary and secondary beneficiaries of the legislation in question.  It may be the case that § 3202(a) confers some benefits on diagnostic-testing providers, but only as a means of serving the underlying goal of providing accessible COVID-19 testing for the benefit of the public.

GS Labs notes that in *Diagnostic Affiliates*, the court found that beneficiaries of the CARES Act are not limited to only one class of persons (patients), but also include providers.  (Pl.'s Reply [Doc. No. 40] at 6–8) (citing 2022 WL 214101, at *7); *see also Saloojas*, 2022 WL 2267786, at *5 (concluding, without discussion, that providers are beneficiaries of § 3202(a), but ultimately finding no implied right of action under § 3202(a)).  However, controlling Eighth Circuit authority requires that a plaintiff be the "especial" beneficiary of the statute, not merely an ancillary beneficiary.  *Osher*, 903 F.3d at 703; *Hofbauer*, 700 F.2d at 1200; *Cedar-Riverside*, 606 F.2d at 257.

Also, GS Labs relies on *Maine Community Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020), in which the Supreme Court held that insurers had the right to payment from the federal government under the Affordable Care Act as the statute imposed an obligation through the use of the word "shall."  (Pl.'s Mem. at 11; Pl.'s Opp'n at 12.) The court in *Diagnostic Affiliates* relied on *Maine Community Health* to support the proposition that the mandatory reimbursement language of § 3202(a) implies a private right of action for such claims.  2022 WL 214101, at *6.   However, *Maine Community Health* did not involve the question of an implied private right of action, and was therefore not subject to the same analysis here, including whether the statutory language focuses on the person regulated as opposed to the individuals protected and whether the plaintiff is a member of the class for whose particular benefit the statute was enacted.  *See Sandoval*, 532 U.S. at 287.

Moreover, reading the text of § 3202 in context, it is clear that the primary beneficiaries are patients.  Section § 3202 falls within "PART II—ACCESS TO HEALTH CARE FOR COVID-19 PATIENTS," subpart A, "COVERAGE OF TESTING AND PREVENTIVE SERVICES."  Pub. L. 116-136.  Section 3202(a) cross references § 6001(a) of FFCRA, which requires insurers to provide coverage for COVID-19 testing, without requiring any cost sharing on the part of patients.  ("A group health plan and a health insurance issuer offering group or individual health insurance coverage . . . shall provide coverage, and shall not impose any cost sharing (including deductibles, copayments, and coinsurance) requirements or prior authorization or other medical management requirements . . .").  This language, along with § 3202(a), issues a directive to insurers to

16

provide their insureds with coverage for COVID-19 testing and requires insurers to reimburse testing providers for conducting such testing.  It commands insurers to act, "focus[ing] on the person regulated rather than the individuals protected" and "creates no implication of an intent to confer rights on a particular class of persons." *Sandoval*, 532 U.S. at 289 (citations omitted).

Accordingly, the Court finds that this factor—whether plaintiff is a member of the class for whose "especial" benefit the statute was enacted—does not support an implied right of action under § 3202(a).  Instead, when read in context, § 3202(a) was intended to implement access to COVID-19 testing for the benefit of patients.  Addressing the CARES Act, a member of Congress stated,

> In the end, the only way to end this crisis—and the only way to get the American economy moving again—is to contain the disease.  This will require, as soon as possible, adopting a new goal.  *That goal should be to test every American who needs it for COVID-19 as soon as possible . . . the sooner we make more tests available and stop telling Americans not to get a test, the better.*

(Compl. ¶ 67) (quoting 166 Cong. Rec. S1895-03 (Sen. Alexander, R-Tenn.)).  While diagnostic testing providers may have incidentally benefitted from the goal of providing COVID-19 testing access to patients, the CARES Act was not intended to especially benefit testing providers.

Even if the Court were to more broadly construe the class of statutory beneficiaries to include diagnostic laboratories such as GS Labs, the Court would still find no congressional intent for a private right and remedy, as the Court discusses below.

17

### 2. Evidence of Legislative Intent to Create or Deny a Private Right of Action and Remedy

GS Labs contends that because § 3202(a) contains no enforcement mechanism, Congress must have necessarily intended to create an implied private cause of action. (Pl.'s Mem. at 11–12; Pl.'s Opp'n at 19–20) (citing *Steele v. Louisville & N.R. Co.*, 323 U.S. 192, 207 (1944)). Medica concedes that technically, § 3202(a) contains no enforcement mechanism, but contends that an enforcement mechanism is found in the FFCRA, § 6001(b). (Def.'s Opp'n at 21; Def.'s Reply at 4–5.) Furthermore, Medica argues that GS Labs relies on outdated authority, dating from a time when the Supreme Court more readily recognized implied causes of action than it does now. (Def.'s Reply at 6.) Thus, if a statute, such as § 3202(a), is silent or ambiguous as to congressional intent, it asserts that courts may not properly imply a private right of action for statutory violations. (*Id.*)

As noted, GS Labs relies on *Steele*, 323 U.S. at 207, in which the Supreme Court held that when Congress enacts statutory provisions "stated in the form of commands," for which "there is no mode of enforcement other than resort to the courts," courts have "jurisdiction and [a] duty to afford a remedy for a breach of statutory duty." While *Steele* has not been expressly overruled, it dates to an earlier time in the mid-20th century when courts adopted a more expansive view of implied causes of action and "assumed that a proper judicial function was to provide such remedies as are necessary to make effective a statute's purpose."[5] *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017) (cleaned up).

---

[5] GS Labs cites several cases for the proposition that the Supreme Court has never rejected *Steele*, but has instead "reaffirmed it several times." (Pl.'s Opp'n at 21; Pl.'s Reply at 5–6.) However, only one of the cases relying on *Steele* cites it for the proposition on

Now, however, courts follow "a far more cautious course, clarifying that, when deciding whether to recognize an implied cause of action, the 'determinative' question is one of statutory intent." *Id.* (citing *Sandoval*, 532 U.S. at 286). Absent such intent to create a private remedy, there can be no private cause of action. *Sandoval*, 532 U.S. at 286–87. Applying this approach in *Syngenta Seeds, Inc. v. Bunge N. Am., Inc.*, 773 F.3d 58, 63 (8th Cir. 2014), the Eighth Circuit declined to find an implied private right of action for statutory violations, even absent an apparent enforcement mechanism, as it found "no indication in either the text . . . or the structure of the [statute] that Congress intended to imply a private cause of action." *Id.*

Courts have commented that the presence of a statutory enforcement mechanism may suggest that Congress intended no other remedy, and thus no private right of action by implication. *See, e.g.*, *Sandoval*, 532 U.S. at 290 (observing that an express enforcement

---

which GS Labs relies—that courts imply a private right of action where judicial enforcement is the only remedy for violations of the statute—and that case, *Graham v. Bhd. of Locomotive Firemen & Enginemen*, 338 U.S. 232, 239 (1940), dates from 1940 and therefore does not follow the Supreme Court's current approach to implied private rights of action. (Pl.'s Opp'n at 21; Pl.'s Reply at 5–6) (citing *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps.*, 138 S. Ct. 2448, 2469 (2018) (noting *Steele* for proposition that a union "may not negotiate a collective-bargaining agreement that discriminates against nonmembers."); *Int'l Bhd. of Elec. Workers v. Foust*, 442 U.S. 42, 47 (1979) (citing *Steele* in support of statement that "[t]he right to bring unfair representation actions is judicially "implied from the statute and the policy which it has adopted."); *Cannon*, 441 U.S. at 691 n.13 (referencing *Steele*, among a collection of cases, and stating that "the Supreme Court has "never refused to imply a cause of action where the language of the statute explicitly conferred a right directly on a class of persons that included the plaintiff in the case"); *Graham*, 338 U.S. at 239 (holding that Norris-LaGuardia Act did not deprive courts of jurisdiction to compel compliance with provisions of the Railway Labor Act for which, among other things, there was no administrative remedy)).

mechanism "suggests that Congress intended to preclude others."); *Transam. Mortg. Advisors*, 444 U.S. at 20 (finding existence of express enforcement provisions made it "highly improbable" that Congress simply "forgot" to provide a private right of action); *Hofbauer*, 700 F.2d at 1201 ("The existence of an administrative enforcement mechanism suggests that no other remedy was intended."); *Osher*, 903 F.3d at 703 (finding no implied right of action based on statutory text and because "Congress also provided for an administrative mechanism to enforce compliance with the Act."). However, the courts in *Murphy Medical*, 2022 WL 743088, at *4–5, and *Saloojas*, 2022 WL 2267786, at *5, found any lack of an enforcement mechanism or remedy under CARES Act § 3202(a) non-determinative of congressional intent.[6]

Indeed, the CARES Act § 3202(a) contains no express statutory enforcement mechanism for the reimbursement of cash-price COVID-19 tests to diagnostic laboratories such as Plaintiff. Medica agrees that technically, § 3202(a) contains no such provision. (Def.'s Opp'n at 21.) However, noting that § 3202(b) provides for federal enforcement of the cash-price requirement against providers, while the corresponding enforcement mechanism against insurers exists in FFCRA § 6001(b), Medica asserts that "[i]t is difficult

---

[6] While GS Labs is critical of the court in *Murphy Medical* for not analyzing all of the *Cort* factors, (Hr'g Tr. [Doc. No. 51] at 21–22), the Supreme Court has never held that the *Cort* factors are entitled to equal weight, and the "[c]entral inquiry" is congressional intent. *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575–76 (1979). Just as the court in *Murphy Medical* found, the Eighth Circuit has likewise recognized intent as determinative, foreclosing the need for further analysis of other factors relevant to an implied private right of action. *Syngenta Seeds*, 773 F.3d at 63 ("Finding no indication in either the text of 7 U.S.C. § 247 or the structure of the USWA that Congress intended to imply a private cause of action in 7 U.S.C. § 247, we need not look further.").

to see how FFCRA § 6001(b) can grant federal agencies the authority to enforce the coverage requirements of FFCRA § 6001(a) without [granting them the enforcement] authority to police the terms (financial or otherwise) on which insurers provide coverage." (*Id.*)  It notes that with no moderating force of government enforcement, if GS Labs has a private right of action, "it can charge 1,000 times Medicare rates, or 1,000,000 times those rates, and recover [its] 'cash price' in full, through litigation." (Def.'s Mem. at 11–12.) Correspondingly, Medica posits, "It is likewise difficult to see how labs can bring private actions under the CARES Act's 'cash price' provisions without intruding on the aspects of the FFCRA Congress entrusted to federal enforcement."  (Def.'s Opp'n at 21–22.)

While Medica's argument appeals to logic, and GS Labs presents a colorable policy argument about the lack of a remedy, the presence or absence of federal enforcement authority under § 3202(a) is unclear at this time.[7]  *See Murphy Med.*, 2022 WL 743088, at *5 n.5) (finding it unclear whether the plaintiff provider was left remediless).

---

[7] Guidance issued jointly by the Departments of Labor, Health and Human Services, and the Treasury suggests that the agencies take no role in enforcing § 3202(a), although it is not entirely clear.  Providing answers to a series of frequently asked questions, including a question about the actions that health plans should take if they identify COVID-19 providers who are not complying with the requirements of § 3202(b) or who "are otherwise acting in bad faith.," the departments advised:

> Although it is the Departments' understanding that most providers have been pricing COVID-19 tests at reasonable levels, generally consistent with reimbursement rates set by the Medicare program, the Departments are aware that some providers have not done so and are using the public health emergency as an opportunity to impose extraordinarily high charges. One way plans and issuers can respond to such practices is by giving participants, beneficiaries, and enrollees information about providers who have negotiated rates for COVID-19 testing with the plan or issuer, or about other providers who adhere to best practice standards, and encouraging participants,

Even assuming the absence of an enforcement mechanism, however, the Court is not persuaded that Congress intended for a private right of action by implication. The Court is mindful of the Supreme Court's disfavor of implied rights of action, and nothing in the text or structure of the CARES Act suggests the intent to provide providers such as GS Labs with a privately enforceable remedy. Rather, the Court agrees with *Murphy Medical* that "[w]hile [the lack of a statutory enforcement mechanism] may provide a good policy reason to create a private right of action, it does not provide an indication that Congress intended to create such a right." *Id*. at *5 (citing *Sandoval*, 532 U.S. at 286–87). As the Supreme Court has stated, without a determinative display of statutory intent, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Sandoval*, 532 U.S. at 286–87. In light of this controlling authority, the Court is unpersuaded by the finding in *Diagnostic Affiliates*, 2022 WL 214101, at *8, that "[a]n implied right of action is a more appropriate construction of [§ 3202(a)] than the creation of a right without any remedy."

GS Labs argues that the structure of § 3202(a) also supports a finding of an implied cause of action for non-contracted providers, i.e., new entrants to the diagnostic testing

---

beneficiaries, and enrollees to rely on these providers. Plans and issuers that identify providers that are violating the cash price posting requirements should report violations to COVID19CashPrice@cms.hhs.gov.

Centers for Medicare & Medicaid Services, *FAQs About Families First Coronavirus Response Act and Coronavirus Aid, Relief, and Economic Security Act Implementation Part 44* (Feb. 26, 2021), at Q6, https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs (Feb. 26, 2021).

market, because it treats two classes of providers differently.  (Pl.'s Reply at 11 n.1; Hr'g Tr. [Doc. No. 51] at 19–20.)  It asserts that the Act permits providers with previously-contracted prices ("incumbent providers") to enforce their negotiated prices through breach of contract actions against insurers, whereas newer, non-incumbent providers have no recourse for enforcing payment at their publicly-posted cash price.  (Pl.'s Reply at 11 n.1.)

The Court disagrees with GS Labs' distinction between the two types of providers. Section 3202(a) does not expressly address the enforcement rights of either type of diagnostic-testing provider.  GS Labs contends that Congress had no need to create a private cause of action for incumbent providers because their right to bring a breach of contract action already exists under both state and federal law.  (*Id*.)  In contrast, GS Labs argues, Congress must have intended to provide a "statutory gap-filler" for non-incumbent providers to facilitate the enforcement of their right to cash-price reimbursement.  (*Id*.)  But in this very lawsuit, GS Labs brings alternative state law claims for unjust enrichment and negligence per se, just as incumbent providers may bring a claim for breach of contract. *See Murphy Med.*, 2022 WL 743088, at *5 n.5 (noting that "while Plaintiff asserts that it will be left without a remedy because state law and ERISA will not compensate its claims, it has nonetheless asserted claims under both.").

Under the CARES Act, Congress treats both types of diagnostic-testing providers the same.[8]  The logical extension of GS Labs' argument might actually result in treating

---

[8] At the hearing on the instant motions, Plaintiff's counsel acknowledged as much, stating, "Congress left enforcement of those rights [for reimbursement] to the providers themselves.  Congress didn't say[,] ['F]ederal agency, you go off and enforce this and

23

the two types of diagnostic-testing providers differently by implying a private right of action under the CARES Act for non-incumbent providers, but denying such a right to incumbent providers because they may avail themselves of state law causes of action.

In sum, the Court finds no indication of congressional intent, either explicit or implicit, under § 3202(a), to create or deny a private right of action and a remedy to diagnostic-testing providers seeking reimbursement from insurers and health care plans for COVID-19 testing services at the publicly-posted cash price. While congressional intent is determinative, the Court nevertheless proceeds to analyze the remaining *Cort* factors.

### 3. Whether Private Right of Action is Consistent With Legislative Scheme

As to whether a private right of action for diagnostic-testing providers would be consistent with the legislative scheme, the Court finds this factor is neutral. The legislative history reflects concern for public health and the need "to test every American who needs it for COVID-19 as soon as possible." 166 Cong. Rec. S1893, S1895; *see also Diagnostic Affiliates*, 2022 WL 214101, at *6 ("It is clear that the legislative objective was to ensure that COVID-19 testing was widely available to the entire population."). While reimbursing testing providers would facilitate that goal in general, the particular relief that GS Labs seeks here—to bring a private action to enforce its right to reimbursement at the cash price of its own choosing (Compl. ¶ 71)—is not particularly consistent with the overarching goal

---

involve yourself in disputes between insurance companies and providers.[']" (Hr'g Tr. at 9.)

of the CARES Act to make diagnostic testing for COVID-19 widely available. Accordingly, the Court finds this factor is neutral.

### 4. Whether it is Inappropriate to Infer a Federal Cause of Action

As to whether the private right of action that Plaintiff seeks to prosecute here is of a type "traditionally relegated to state law," *Cort*, 422 U.S. at 78, the Court finds that the right Plaintiff seeks is not traditionally relegated to state law. As the Court in *Saloojas* stated, a "cause of action for diagnostic testing reimbursement, particularly with respect to a global pandemic, is not 'traditionally relegated to state law' or 'in an area basically the concern of the States.'" 2022 WL 2267786, at *5 (quoting *Cort*, 422 U.S. at 78).

### 5. Analysis of Factors

The Court finds there is no private right of action or remedy under the CARES Act for diagnostic-testing providers to recover reimbursement for COVID-19 testing at the publicly-posted cash price. Even if all three of the other *Cort* factors were to favor Plaintiff, because congressional intent to create a right and a remedy is determinative and is lacking here, the Court would reach the same result. *See id*. (finding first, third, and fourth *Cort* factors favored provider, but were outweighed by the lack of any congressional intent to provide a right of action or a remedy).

Because the Court finds that GS Labs has no private right of action under Count I for a violation of the CARES Act, Medica's Motion to Dismiss is granted in this regard. Because Count I fails as a matter of law, it is dismissed with prejudice.

Additionally, because there is no private right of action under § 3202(a) of the CARES Act, the Court likewise dismisses with prejudice Count II, in which GS Labs seeks

a declaratory judgment that (1) it has a private right of action under the CARES Act, and (2) the CARES Act requires Medica to fully reimburse GS Labs at the publicly-posted cash price for COVID-19 testing.  *Doe v. Univ. of St. Thomas*, 240 F. Supp. 3d 984, 989 (D. Minn. 2017) ("Because there is no private right of action [to enforce certain regulatory requirements under Title IX], the Declaratory Judgment Act cannot be used as an independent cause of action [to enforce those regulatory requirements] and, therefore, Doe's claim fails as a matter of law."); *Wolfchild v. Redwood Cnty.*, 91 F. Supp. 3d 1093, 1102 (D. Minn. 2015) ("Because the 1863 Act does not provide for a private right of action, Plaintiffs cannot rely on that Act in seeking a declaration of possessory rights.").

In light of these rulings, the Court also denies Plaintiff's cross motion for partial summary judgment on its declaratory judgment claim.

### C.    State Law Claims

As noted, GS Labs asserts claims for unjust enrichment and negligence per se arising under Minnesota law.[9]  (Compl., Counts III & IV.)  Plaintiff invokes the Court's supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367.  (*Id*. ¶ 4.)

Before addressing whether these state law claims survive Medica's Rule 12(b)(6) challenge, the Court must first determine whether to exercise supplemental jurisdiction over them.  A district court may decline to exercise supplemental jurisdiction over a non-federal claim if the court has dismissed "all claims over which it has original jurisdiction."

---

[9] GS Labs also asserts a claim for punitive damages pursuant to Minn. Stat. §§ 549.191 and 549.20 (Compl., Count VI), which Medica moves to dismiss.

28 U.S.C. § 1367(c)(3).  The Supreme Court has stated that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

Here, the interests of judicial economy and convenience do not weigh heavily in favor of retaining supplemental jurisdiction or declining it.  However, because this case is in a relatively early posture and the Court has not invested significant resources in reaching this ruling, the Court finds that declining to exercise supplemental jurisdiction properly serves the interests of judicial economy and convenience.  In addition, there is no unfairness here, as "litigants knowingly risk the dismissal of pendent claims when they invoke the court's discretionary supplemental jurisdiction." *Marianist Province of U.S. v. City of Kirkwood*, 944 F.3d 996, 1003 (8th Cir. 2019) (citation omitted) (cleaned up).  Finally, because Minnesota courts are well familiar with claims for unjust enrichment, negligence per se, and punitive damages, the interest of comity militates in favor of declining to exercise supplemental jurisdiction.

Weighing these factors, the Court declines to exercise supplemental jurisdiction over GS Labs' state law claims.  Consequently, the Court dismisses without prejudice the remaining claims in Counts III, IV, and VI of the Complaint.[10]  *Johnson v. City of Pine Bluff*, 450 Fed. App'x 557, 558 (8th Cir. 2012) (holding that where district court declines

---

[10] Again, the Complaint contains no Count V.

to exercise supplemental jurisdiction over state law claims, claims should be dismissed

without prejudice).

## III.   CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.   Plaintiff's Motion for Partial Summary Judgment [Doc. No. 8] is **DENIED**.

2.   Defendant's Motion to Dismiss [Doc. No. 29] is **GRANTED**.

3.   The following counts in the Complaint [Doc. No. 1] are **DISMISSED WITH PREJUDICE**:  Counts I and II.

4.   The following counts in the Complaint [Doc. No. 1] are **DISMISSED WITHOUT PREJUDICE**:  Counts III, IV, and VI.

5.   As there is no Count V in the Complaint and no remaining claims, the Clerk of Court is directed to enter judgment.


**LET JUDGMENT BE ENTERED ACCORDINGLY**.


Dated: September 20, 2022                              s/Susan Richard Nelson
                                                      SUSAN RICHARD NELSON
                                                      United States District Judge